IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | 4:19-cr-00029-SMR-CFB-1 |
| Plaintiff, | |
| vs. | |
| LUIS ENRIQUE PAZ MIRALDA, | REPORT AND RECOMMENDATION |
| Defendant. | |

## I.    INTRODUCTION

The matter before the Court is Defendant's Motion to Suppress filed on May 6, 2019 [20]. The Government filed a resistance on May 24, 2019 [29]. An evidentiary hearing was held by the undersigned on June 20, 2019 [34]. Attorney Melanie Keiper appeared for Defendant. Assistant United States Attorney MacKenzie Tubbs appeared for the Government [34]. The Government called two witnesses at the evidentiary hearing, Immigration and Customs Enforcement (ICE) Officers Jason Mulford and Stephen Gampp. The Court admitted Government's Exhibit 1 and Defense Exhibits A and B into evidence.

The Government charged Defendant with illegal reentry into the United States following deportation [1]. *See also* (Def. Mot. to Suppress [20] ¶ 1). On February 12, 2019, at 11:30 a.m., in Des Moines, Iowa, ICE Officers Mulford and Gampp stopped the vehicle Defendant in which Defendant was a passenger. (*Id.* ¶ 2). Officers Mulford and Gampp stopped the vehicle in an effort to arrest a different target individual suspected of illegal reentry, Mario Figueroa. Defendant "moves to suppress all evidence obtained through the illegal stop of the vehicle in which he was a

passenger, and his subsequent illegal seizure." (*Id.* at 1). Defendant contends the ICE Officers lacked reasonable and articulable suspicion to initiate the traffic stop, and that once stopped, Officer Mulford elicited incriminating testimony from Defendant without first advising him of his *Miranda* rights. (*Id.* ¶ 2).

## II.    FACTUAL AND PROCEDURAL HISTORY

In January of 2019, Officer Mulford received information that an individual named Mario Figueroa had illegally re-entered the United States. (Tr. Mot. Hearing [35] at 10 ¶¶ 2-3). Officer Mulford was apprised of Mario Figueroa's reentry status while investigating a different ICE fugitive. (*Id.* ¶¶ 5-8). When investigating the address which the original ICE fugitive had provided, 1602 8th St. in Des Moines, Officer Mulford ran the license plate of a gray 2002 Chevy Trailblazer ("the SUV") parked at the 8th St. residence. (*Id.* at 10-12). The SUV was registered to Figueroa, also listed as residing at the address of 1602 8th St. (*Id.* at 12 ¶¶ 12-25); *see also* (Gov. Resistance; Exhibit 1 [29-2]).

Officer Mulford discovered that Figueroa previously had been removed and a records check revealed no indication that Figueroa subsequently had re-entered the country legally. (Tr. Mot. Hearing [35] at 11 ¶¶ 1-5). Through his records check of Figueroa, Officer Mulford obtained a color photograph of Figueroa from the ICE database. (*Id.* at 10 ¶¶ 19-24; 26 ¶¶ 9-11).

Officer Mulford then surveilled the 1602 8th St. address a handful of times between initially learning about Figueroa and February 12, 2019. (*Id.* at 13 ¶¶ 1-7). To facilitate his surveillance of Figueroa, Officer Mulford compiled a Field Operations Worksheet ("FOW"). (*Id.* at 25 ¶¶ 3-13). The FOW was a one-page summary of information necessary to identify Figueroa, including among other things, Figueroa's: height, weight, eye color, hair color, complexion, age, sex, country

of citizenship, and address. *See* (*Id.* ¶¶ 19-21). The photo of Figueroa obtained from the ICE database, although in black and white, also was included on the FOW. (*Id.* at 26 ¶¶ 21-22).

In the early afternoon of February 12, 2019, Officer Mulford was performing surveillance of the 1602 8th St. residence. (*Id.* at 13 ¶¶ 8-12). He was within a block of the residence while conducting surveillance. (*Id.* at 15 ¶ 10). He was wearing plain clothes and was in an unmarked vehicle, the typical practice when conducting surveillance. (*Id.* at 13 ¶¶ 13-23). To identify himself as an ICE Officer, he wore his ICE badge on his left hip and carried his ICE credentials in his pocket. (*Id.* ¶¶ 18-21; 14 ¶¶ 20-24). After about an hour or two, Officer Mulford observed two males exit the back of the residence and enter the SUV, which was parked in the driveway of the residence. (*Id.* at 15 ¶¶ 3-4; 23 ¶¶ 4-6). Officer Mulford testified that both individuals matched the description of Figueroa: they shared similar height (between 5'6-5'8), weight, build, and stature. (*Id.* at 15 ¶¶ 5-7). Officer Mulford testified on cross-examination that Figueroa is 39 years old with black hair and Defendant is 54 years old and bald. (*Id.* at 23 ¶¶ 22-25; 24 ¶¶ 1-2; 29 ¶¶ 23-25; 30 ¶¶ 1-3). He testified that he was not 100% sure that either individual was Figueroa, but it was likely that one of them was based on the above shared characteristics and the link between Figueroa, the SUV, and the residence. (*Id.* at 29 ¶¶ 19-22).

At that point, Officer Mulford notified another ICE Officer nearby, Officer Gampp, who was in a separate unmarked vehicle. (*Id.* at 15 ¶¶ 12-15). Officer Gampp had surveilled the 1602 8th St. residence on February 11, 2019, and had seen an individual matching Figueroa's description doing yardwork but did not make contact. (*Id.* at 42 ¶¶ 3-15; 50 ¶¶ 6-25; 51 ¶¶ 1-5). On February 12, 2019, Officer Gampp also was dressed in plain clothes. (*Id.* at 43 ¶¶ 23-24). He was armed, but his firearm was appended to his hip and was not visible. (*Id.* at 52 ¶¶ 22-25; 53 ¶¶ 1-3). Officer Gampp drove by the residence in time to see the individuals enter the SUV. (*Id.* at 44 ¶¶ 2-7).

Officer Gampp had the FOW with him and had reviewed the photograph of Figueroa prior to this incident. (*Id*. ¶¶ 8-10; 51 ¶¶ 9-14). He also believed both individuals matched the description of Figueroa based on their height, weight, and hair. (*Id*. at 44 ¶¶ 11-16). Officer Gampp was not 100% positive either individual was Figueroa. (*Id*. at 54 ¶¶ 3-11). Officer Gampp then drove past the home in the direction he believed the SUV would travel to position himself to make a vehicle stop. (*Id*. at 44 ¶¶ 17-21).

Officers Mulford and Gampp performed a vehicle stop of the SUV. (*Id*. ¶¶ 22-23). In making the stop, the officers turned on the emergency lights on their unmarked vehicles, which are generally in the grill and lights of the vehicles. (*Id*. at 32 ¶¶ 15-25). Because the officers were aware there was a passenger in the vehicle, to ensure officer safety Officer Gampp approached the driver's side of the SUV while Officer Mulford approached the passenger's side. (*Id*. at 34 ¶¶ 4-9). On the driver's side, Officer Gampp identified himself to the driver by his badge on his necklace and referred to himself as "Officer Gampp." (*Id*. at 45 ¶¶ 12-18). He then asked the driver for identification. (*Id*. ¶ 18). The driver provided Officer Gampp with an identification card bearing the name of Mario Figueroa. (*Id*. ¶ 19-23). Officer Gampp knew that was the name of Officer's Mulford's target. (*Id*. ¶ 24-25; 46 ¶ 1). Officer Gampp then arrested the driver. (*Id*. at 46 ¶¶ 2-4).

Simultaneously on the passenger's side, Officer Mulford identified himself to the passenger as an immigration officer, and believes he also showed the passenger his "credentials" which contains, *inter alia*, his badge and photograph. (*Id*. at 36 ¶¶ 8-22). Officer Mulford asked Defendant his name, and Defendant answered while simultaneously handing Officer Mulford a Honduran ID bearing his name. (*Id*. at 16 ¶¶ 10-12). Officer Mulford then asked if Defendant was a citizen of Honduras and if he had any permission to be in the United States. (*Id*. ¶¶ 13-16). Defendant responded that he was a citizen of Honduras and did not have permission to be in the

United States. (*Id.* ¶¶ 17-19). At that point, Officer Mulford made an administrative arrest of Defendant. (*Id.* ¶¶ 20-25). Officer Mulford could not remember if he spoke in English or Spanish during this exchange, but testified that he speaks Spanish, and would have used whatever language Defendant was using. (*Id.* at 36 ¶¶ 23-25; 37 ¶¶ 1-6). Officer Mulford was not aware that the driver of the vehicle was indeed Figueroa until after the two suspects had been questioned in the vehicle. (*Id.* at 34 ¶¶ 10-25).

Both Defendant and Figueroa were subsequently taken to the ICE Removal Office in Des Moines. (*Id.* at 17 ¶¶ 1-3). Agent Gampp took Defendant's fingerprints and asked him some biographical information. (*Id.* at 58 ¶¶ 18-25; 59 ¶¶ 1-10). Defendant was later Mirandized and subsequently gave a sworn statement admitting that he illegally reentered the United States. (*Id.* at 59 ¶¶ 8-15); *see also* (Def. Exhibit A [21]).

Officer Gampp authored a report of investigation as pertaining to Defendant. The report relayed in pertinent part that "two subjects closely matching the targeted subject's physical description entered an SUV." (*Id.* at 53 ¶¶ 16-21). The report also included the phrase, "due to the early hour, lack of ambient lighting, and the officers' position on the street, a positive ID could not be made." (*Id.* at 55 ¶¶ 4-6). Officer Gampp testified that the report about "the early hour, lack of ambient lighting, and the officers' position on the street" was a mistake, in that it was language carried over from a draft report of a different investigation. (*Id.* at 43 ¶¶ 5-12). Regarding the statement in the report that a "positive ID could not be made," both Officers testified the statement was accurate in that they were not 100% sure either individual was Figueroa. (*Id.* at 31 ¶¶ 5-7; 54 ¶¶ 7-11).

### III.   LEGAL STANDARDS

Defendant moves to suppress evidence obtained from the stop of the vehicle and through the subsequent questions law enforcement officers asked during the stop. Defendant argues the initial stop of the vehicle violated his Fourth Amendment rights.   Defendant further argues the subsequent questions law enforcement officers asked him during the stop violated his Fifth Amendment rights.

The Fourth Amendment provides "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . .." U.S. CONST. amend. IV. The Fifth Amendment protects against an individual being "compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law." U.S. CONST. amend. V. These protections "appl[y] as much to illegal aliens inside this country as [they] do[] to citizens." *Martinez Carcamo v. Holder*, 713 F.3d 916, 921 (8th Cir. 2013).

"To deter violations of th[ese] right[s], the Supreme Court long ago developed the exclusionary rule." *Id.* "[W]hen applicable, [the exclusionary rule] forbids the use of improperly obtained evidence at trial." *Herring v. United States*, 555 U.S. 135, 139 2009). The exclusionary rule; however, is not a "necessary consequence" of a Constitutional violation. *Id.* at 141. It is instead an option of last resort, to be used only when the substantial social costs of its application are outweighed by the benefit of deterring future violations. *Id.* at 141-42.

"The law is settled that in Fourth Amendment terms a traffic stop entails a seizure" of the driver and passengers. *Brendlin v. California,* 551 U.S. 249, 255 (2007). "Under the Fourth Amendment, a traffic stop is reasonable if it is supported by either probable cause or an articulable and reasonable suspicion that a traffic violation has occurred." *United States v. Washington*, 455

F.3d 824, 826 (8th Cir. 2006). "An officer who observes a violation of the law has probable cause to initiate a traffic stop, and such a stop comports with the Fourth Amendment." *United States v. Riley*, 684 F.3d 758, 762 (8th Cir. 2012) (quoting *United States v. Peralez*, 526 F.3d 1115, 1119 (8th Cir. 2008)). Reasonable suspicion justifies a traffic stop when:

> Only when an officer develops a reasonable, articulable suspicion that criminal activity is afoot . . .. This requires that the officer's suspicion be based upon particularized, objective facts which, taken together with rational inferences from those facts, reasonably warrant suspicion that a crime is being committed.

*Id.* at 763 (quoting *United States v. Jones*, 269 F.3d 919, 926 (8th Cir. 2001)). "While 'reasonable suspicion' must be more than an inchoate 'hunch,' the Fourth Amendment only requires that police articulate some minimal, objective justification for an investigatory stop." *Id.* (quoting United *States v. Fuse*, 391 F.3d 924, 929 (8th Cir. 2004)).

If an officer initiates a stop based on reasonable suspicion of criminal activity, the officer may conduct a limited investigation "reasonably related in scope to the circumstances which justified the interference in the first place." *Jones*, 269 F.3d at 924. (quoting *Terry v. Ohio*, 392 U.S. 1, 20 (1968)). "Like a *Terry* stop, the tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's "mission"—to address the traffic violation that warranted the stop." *Rodriguez v. United States*, 135 S. Ct. 1609, 1614, 191 L. Ed. 2d 492 (2015). "This means that the Fourth Amendment intrusion 'must be temporary and last no longer than is necessary to effectuate the purpose of the stop" and that the officer should employ the least intrusive means available to dispel the officer's suspicion in a timely fashion.'" *Jones*, 269 F.3d at 924.

> Consistent with these principles, our case law teaches us that a police officer, incident to investigating a lawful traffic stop, may request the driver's license and registration, request that the driver step out of the vehicle, request that the driver wait in the patrol car, conduct computer inquiries to determine the validity of the license and registration, conduct computer searches to investigate the driver's

criminal history and to determine if the driver has outstanding warrants, and make inquiries as to the motorist's destination and purpose.

*Id.*

"The *Miranda* exclusionary rule . . . serves the Fifth Amendment." *Oregon v. Elstad*, 470 U.S. 298, 306 (1985); *see also Miranda v. Arizona*, 384 U.S. 436 (1966). *Miranda* requires a "a fourfold warning be given to a person in custody before he is questioned, namely, that he has a right to remain silent, that anything he says may be used against him, that he has a right to have present an attorney during the questioning, and that if indigent he has a right to a lawyer without charge." *Miranda*, 384 U.S. at 504. "When police ask questions of a suspect *in custody* without administering the required warnings, Miranda dictates that the answers received be presumed compelled and that they be excluded from evidence at trial in the State's case in chief. *Elstad*, 470 U.S. at 317 (emphasis added).

"An officer's obligation to administer Miranda warnings attaches, however, 'only where there has been such a restriction on a person's freedom as to render him 'in custody.'" *Stansbury v. California*, 511 U.S. 318, 322 (1994) (quoting *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977)). "To determine whether a suspect was in Miranda custody we have asked whether there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *Maryland v. Shatzer*, 559 U.S. 98, 112 (2010) (omitting internal quotations).

> The following non-exclusive factors inform the custody inquiry: (1) whether the suspect was informed that he was free to leave and that answering was voluntary; (2) whether the suspect possessed freedom of movement; (3) whether the suspect initiated contact or voluntarily acquiesced; (4) whether strong arm tactics or strategies were employed; (5) whether the atmosphere was police dominated; or, (6) whether the suspect was placed under arrest at the end of questioning.

*United States v. Muhlenbruch*, 634 F.3d 987, 996 (8th Cir. 2011).

"The temporary and relatively nonthreatening detention involved in a traffic stop or *Terry* stop . . . does not constitute Miranda custody." *Id*. at 113. This is because "[t]wo features of an ordinary traffic stop mitigate the danger that a person questioned will be induced to speak where he would not otherwise do so freely." *Berkemer v. McCarty*, 468 U.S. 420, 437 (1984) (omitting internal quotations and citations). "First, detention of a motorist pursuant to a traffic stop is presumptively temporary and brief." *Id*. "In this respect, questioning incident to an ordinary traffic stop is quite different from stationhouse interrogation, which frequently is prolonged, and in which the detainee often is aware that questioning will continue until he provides his interrogators the answers they seek." *Id*. 437-38. "Second, circumstances associated with the typical traffic stop are not such that the motorist feels completely at the mercy of the police." *Id*. at 438. "Perhaps most importantly, the typical traffic stop is public, at least to some degree." *Id*. "This exposure to public view both reduces the ability of an unscrupulous policeman to use illegitimate means to elicit self-incriminating statements and diminishes the motorist's fear that, if he does not cooperate, he will be subjected to abuse." *Id*.

## IV.   LEGAL ANALYSIS

Defendant challenges the traffic stop and the questioning by ICE officers that took place during the traffic stop. More specifically, Defendant first argues the officers lacked both probable cause and reasonable suspicion of criminal activity to justify the initial stop of the SUV. (Def. Brief [20-1] at 3-6). Defendant next argues that Officer Mulford's questioning of Defendant during the traffic stop violated his *Miranda* rights. (*Id*. at 6-9). Accordingly, Defendant requests his admissions regarding his illegal reentry be suppressed. The undersigned will address each question in turn.

A.      **Traffic Stop**

Defendant argues the officers lacked reasonable articulable suspicion to stop the SUV.
Defendant argues that because neither officer "positively identified" either individual as Figueroa,
they had no reason to stop the vehicle. (Tr. Mot. Hearing [35] at 66-67). Defendant further argues
that because Figueroa and Defendant are of different ages and have different hair, the Officers'
stated beliefs that both individuals matched Figueroa's description could not be true. (*Id.* at 67-
68).

The Officers had reasonable suspicion to conduct a traffic stop of the SUV. As an initial
matter, Defendant's assertion that the officers lacked reasonable suspicion because they were not
"positive" that either individual was Figueroa misconstrues the applicable standard. "Although a
mere 'hunch' does not create reasonable suspicion, the level of suspicion the standard requires is
considerably less than proof of wrongdoing by a preponderance of the evidence, and obviously
less than is necessary for probable cause." *Navarette v. California*, 572 U.S. 393, 397 (2014)
(omitting internal citations and quotations).

The Officers here had far more than a "hunch" that one of the individuals who entered the
SUV had illegally reentered the country. Officer Mulford knew the SUV was registered to the
1602 8th St. residence in the name of Figueroa - an individual who had previously been removed
and whom Officer Mulford confirmed there was no documentation indicating lawful reentry. The
SUV was parked at the 1602 8th St. residence when Officer Mulford observed, within a block's
radius, two adult males exit the residence and enter the vehicle. Officer Mulford possessed the
FOW containing Figueroa's physical characteristics and photo. He determined that both
individuals matched the description of Figueroa based on similar height, weight, build, and stature.
Officer Gampp, also in possession of the FOW and familiar with the photo of Figueroa, indicated

that the individuals matched the description of Figueroa as he observed them enter the SUV. The foregoing demonstrates that the officers had reasonable suspicion that one of the men in the vehicle was Figueroa and that he was committing a crime by being in the country illegally. *See United States v. Tamayo-Baez*, 820 F.3d 308, 312 (8th Cir. 2016) (finding ICE agent had reasonable suspicion to perform traffic stop of vehicle under similar circumstances, where the vehicle was registered to the suspect's wife).

Defendant questions the accuracy of the Officers' observations that the two individuals matched the description of Figueroa. Defendant argues that because of his age and the fact that he is bald, it would be impossible for him to match the description of Figueroa, who had hair both on February 12 and in the photograph possessed by Officers Mulford and Gampp. Because Figueroa was indeed in the vehicle, Defendant seems to argue that he and Figueroa look so patently different that the officers were necessarily precluded from honestly and reasonably believing both individuals matched the description of Figueroa, and as a result the officers could not have honestly and reasonably believed that *either* individual matched the description.

The undersigned disagrees. Notably, Defendant does not challenge that he and Figueroa do share the same height, weight, and build. Given these similarities, differing hairstyle and age (without more) would not preclude the officers from honestly and reasonably finding that both suspects matched Figueroa's description. *See United States v. Black-McCormick*, No. 12-00363-14-CR-W-DGK, 2014 WL 7005189, at *3 (W.D. Mo. Dec. 10, 2014) ("Inherent in the concept of reasonable suspicion is the fact that officers may be mistaken in their beliefs. The keystone in such cases hinges on reasonableness."); *United States v. Neemann*, 61 F. Supp. 2d 944, 951 n.1 (D. Neb. 1999) (finding officer had reasonable suspicion to stop defendant's vehicle because the officer mistook him for someone he knew was violating the terms of supervised release where defendant

11

and suspect looked "remarkably similar" despite their differing hair, facial hair, and 50 pound difference in weight). The undersigned accordingly recommends Defendant's Fourth Amendment ground for suppression be denied.

## B.    Questioning

Defendant argues that any questioning of him violated his *Miranda* rights. Defendant argues that he was in custody at the time of the traffic stop largely because the Officer's sole purpose in initiating the traffic stop was to initiate the arrest of Figueroa for illegal reentry. Defendant thus argues Officer Mulford's questioning was improper because he knew or should have known it was "reasonably likely to elicit an incriminating response from the suspect." *United States v. Briones*, 390 F.3d 610, 612 (8th Cir. 2004) (omitting interal quotations)

Defendant was not in custody when he first admitted that he was in the United States illegally, and thus *Miranda* is an inapplicable basis on which to suppress his admissions. Where an officer has reasonable suspicion that "a particular vehicle may contain aliens who are illegally in the country, he may stop the car briefly and investigate the circumstances that provoke suspicion." *United States v. Brignoni-Ponce*, 422 U.S. 873, 881 (1975). "The officer may question the driver and passengers about their citizenship and immigration status, and he may ask them to explain suspicious circumstances, but any further detention or search must be based on consent or probable cause." *Id.* at 881–82. The Eighth Circuit has reiterated that an officer may ask "a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions." *United States v. Rodriguez-Arreola*, 270 F.3d 611, 617 (8th Cir. 2001)

In *Rodriguez-Arreola*, the Eighth Circuit specifically held that an officer may ask a vehicle's passenger whom the officer reasonably suspects is not a citizen whether he is a legal

alien, and this type of investigation does not itself turn a traffic stop into a custodial interrogation. *Rodriguez-Arreola*, 270 F.3d at 617. The officer had reasonable suspicion to inquire into the defendant's alienage where the driver of the vehicle the defendant was in had indicated that the defendant was not a legal alien in response to the officer's questioning. *Id.* When the officer subsequently asked the defendant whether he was a legal alien, the Eighth Circuit held that the defendant was not in custody; rather, the officer was "still in a stage of investigation and attempting to confirm what [the driver] had told him." *Id. See also United States v. Rodriguez-Hernandez*, 353 F.3d 632, 635 (8th Cir. 2003) ("Given Ayon's statement that Rodriguez–Hernandez was not legally present in this country, Deputy Decker had reasonable suspicion to inquire into her alienage."); *United States v. Soriano-Jarquin*, 492 F.3d 495, 501 (4th Cir. 2007) (finding that an officer who stops a vehicle may ask the passengers for identification for safety reasons, and that holding a vehicle with suspected illegal aliens so that ICE agents could conduct an administrative immigration inquiry did not turn the traffic stop into a custodial interrogation).

Officer Mulford's questioning of Defendant is substantively similar to what occurred in *Rodriguez-Arreola*. Officer Mulford approached the vehicle and asked Defendant what his name was. Defendant responded by providing his name and Honduran ID. Officer Mulford then asked if he was a citizen of Honduras and if he had any permission to be in the United States. This extremely brief line of questioning, as in *Rodriguez-Arreola*, did not turn a traffic stop into a custodial interrogation. Especially when considering all of the attendant circumstances regarding the investigation and surveillance of Figueroa, Officer Mulford was entitled to ask Defendant questions about his immigration status after being handed a Honduran ID. Officer Mulford's follow-up question as to whether Defendant had permission to be in the United States fell within

the "moderate" amount of questioning an officer is permitted to conduct during the investigatory phase.

Defendant's argument that the otherwise garden-variety traffic stop was a custodial interrogation because Officers Mulford and Gampp work for ICE has repeatedly been rejected by district courts in Iowa. *See United States v. Lopez-Tubac*, No. CR18-3020-LTS, 2018 WL 3995950, at *5 (N.D. Iowa Aug. 21, 2018) ("Callison's questions were within the scope of gathering biographical information and allowed by the statutory authority given to immigration enforcement officers. Therefore, the information provided by Lopez-Tubac was not obtained in violation of Miranda."); *United States v. Tamayo-Baez*, No. CR14-3055, 2014 WL 7366102, at *4 (N.D. Iowa Dec. 24, 2014), *report and recommendation adopted*, No. 14-CR-3055-LRR, 2015 WL 875391 (N.D. Iowa Mar. 2, 2015), *aff'd*, 820 F.3d 308 (8th Cir. 2016) ("The initial questioning, a variation of which is undoubtedly conducted by officers thousands of times every day in traffic stops all over the country, cannot be fairly characterized as 'the functional equivalent of formal arrest.'"); *United States v. Mireles Puente*, No. 4:18-cr-00121-RGE-HCA, at 7-11 (S.D. Iowa Aug. 8, 2018) (finding no merit to defendant's argument that the "questions sought incriminating information, for which ICE officers could arrest Mr. Mireles, and Mr. Mireles should have been read his *Miranda* rights prior to questioning."). These courts have all extended the rationale of *Rodriguez-Arreola* to ICE officers. The undersigned sees no reason to depart, and accordingly recommends Defendant's Fifth Amendment ground for suppression be denied.

## V.     REPORT AND RECOMMENDATION AND ORDER

Based on the foregoing, the undersigned recommends Defendant's Motion to Suppress be **denied**.

IT IS ORDERED that the parties have until **July 24, 2019** to file written objections to the Report and Recommendation, pursuant to 28 U.S.C. § 636(b)(1). *Thompson v. Nix*, 897 F.2d 356, 357 (8th Cir. 1990); *Wade for Robinson v. Callahan*, 976 F. Supp. 1269, 1276 (E.D. Mo. 1997). Any objections filed must identify the specific portions of the Report and Recommendation and relevant portions of the record to which the objections are made and must set forth the basis for such objections. See FED. R. CIV. P. 72; *Thompson*, 897 F.2d at 357. Failure to timely file objections may constitute a waiver of a party's right to appeal questions of fact. *Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Griffini v. Mitchell*, 31 F.3d 690, 692 (8th Cir. 1994); *Halpin v. Shalala*, 999 F.2d 342, 345 & n.1, 346 (8th Cir. 1993); *Thompson*, 897 F.2d at 357.

**IT IS SO ORDERED.**

Dated July 10, 2019.

Helen C. Adams
Chief U.S. Magistrate Judge